IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–000150–EWN–MJW

MARLA G. SEWELL, individually and as
parent and next friend of Brooke Sewell,

      Plaintiff,

v.

SAFECO INSURANCE COMPANY OF
AMERICA, an insurance corporation,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

      This is an insurance case.  Plaintiff Marla Sewell asserts that Defendant Safeco Insurance Company of America wrongfully refused to pay uninsured motorist insurance benefits allegedly owed in connection with the demise of her husband.  More precisely, Plaintiff asserts that because she unnecessarily paid for uninsured and underinsured ("UM/UIM") insurance coverage on three vehicles, she is entitled to three times the coverage limit, and Defendant has wrongfully paid only the limit.  This matter is before the court on "Defendant's Motion for Summary Judgment," filed September 26, 2006.  Jurisdiction is premised upon diversity of citizenship pursuant to 28 U.S.C.A § 1332 (West 2007).

-1-

# FACTS

## 1.   *Factual Background*

From 2001 until 2004, Plaintiff and her husband, Chris Sewell, were insured by Defendant pursuant to an insurance policy (the "Policy") covering several automobiles.  (Def.'s Mem. Br. in Supp. of Mot. for Summ. J., Statement of Undisputed Material Facts ¶ 2 [filed Jan. 26, 2006] [hereinafter "Def.'s Br."]; *see also* Notice of Removal, Ex. C ¶ 7 [Compl.] [hereinafter "Compl."].)[1]  The Policy included, but was not limited to, UM/UIM coverage for bodily injury and death.  (Def.'s Br., Statement of Undisputed Material Facts ¶ 1; Compl. ¶ 6.)  Specifically, the Policy stated that for each vehicle covered, Defendant would "pay damages which an insured is legally entitled to recover from the owner or operator of an uninsured motor vehicle or underinsured motor vehicle because of bodily injury: 1. sustained by an insured; and 2. caused by an accident."  (Def.'s Br., Statement of Undisputed Material Facts ¶ 3; Compl. ¶ 9.)  The Policy defined "insured" as the policyholder, the policyholder's family members, and "[a]ny other person **occupying [the policyholder's] covered auto**."  (Pl.'s Resp., Ex. 1.1 at 12 [Policy] [emphasis in

---

[1] This court's practice standards include the following instruction: "Any party opposing the motion for summary judgment shall, in a section of the brief . . . styled 'Response to Statement of Undisputed Material Facts,' admit or deny the asserted material facts set forth by the movant." (Practice Standards — Civil, Special Instructions Concerning Motions for Summary Judgment ¶ 4.)  Wholly ignoring these standards, Plaintiff did not respond to any of Defendant's proffered statements of fact.  (*See* Pls.' [sic] Mem. Br. in Opp'n to Def.'s Mot. for Summ. J. [filed Oct. 20, 2006] [hereinafter "Pl.'s Resp."].)  Defendant noted Plaintiff's failure in its reply brief, but neither party has moved to strike or amend the offending response brief.  (Def.'s Reply in Supp. of Mot. for Summ. J. [filed Nov. 14, 2006] [hereinafter "Def.'s Reply"].)  In moving for summary judgment, Defendant exclusively relies on Plaintiff's deposition testimony and the allegations contained in her complaint.  (*See* Def.'s Br.)  Accordingly, the court looks to those sources in making its determinations of fact.

original].)[2]  The Policy stated further — and in all capital letters — that policyholders "CANNOT

ADD TOGETHER TWO OR MORE LIMITS OF INSURANCE ON A POLICY COVERING

MULTIPLE AUTOMOBILES OR ON MULTIPLE POLICIES COVERING [] AN INSURED.

THIS ADDING OF LIMITS IS COMMONLY REFERRED TO AS STACKING."  (*Id.*, Ex. 1.1

at 14 [Policy] [emphasis in original].)

On December 5, 2004, Lance James Feist robbed a bank at a Wal-Mart store and

carjacked a vehicle to escape the scene.  (Def.'s Br., Statement of Undisputed Material Facts ¶ 4;

Compl. ¶ 12.)  While fleeing the pursuit of police officers in the stolen vehicle, Mr. Feist, an

uninsured motorist, struck Mr. Sewell's vehicle at a high rate of speed.  (Def.'s Br., Statement of

Undisputed Material Facts ¶ 4; Compl. ¶ 12.)  Mr. Sewell was fatally injured in the accident.

(Def.'s Br., Statement of Undisputed Material Facts ¶ 4; Compl. ¶ 12.)  At the time of the

accident, Plaintiff and Mr. Sewell maintained and paid premiums for $300,000 in UM/UIM

coverage on three vehicles.  (*See* Pl.'s Resp. at 14.)  The vehicle Mr. Sewell was driving at the

time of the accident was covered under the Policy.  (Def.'s Br., Statement of Undisputed Material

Facts ¶ 5; Compl. ¶ 13.)  Following the accident, Defendant acknowledged that Plaintiff was

entitled to uninsured motorist insurance benefits and offered Plaintiff the Policy limit of $300,000.

(Def.'s Br., Statement of Undisputed Material Facts ¶ 6, Ex. A at 189 [Pl. Dep.]; Compl. ¶ 15.)

---

[2]Plaintiff presents the Policy in two separate parts.  (Pl.'s Resp., Ex. 1.)  To avoid
confusion as to page numbering, the court designates the part with a corresponding numeral
following the exhibit number.

Plaintiff initially refused the offer.  (Def.'s Br., Ex. A at 189 [Pl. Dep.].)  After hiring counsel,

Plaintiff accepted the $300,000, but retained her rights to sue.  (*Id.*, Ex. A at 189–90 [Pl. Dep.].)

**2.     *Procedural History***

   **a.     *UM/UIM Coverage Generally***

      Before turning to the procedure of this case, the court briefly describes the state of the law

concerning UM/UIM coverage.  Until relatively recently, Colorado insurance companies often

included "owned but not insured" exclusions, which provided that UM/UIM coverage would not

extend to accidents involving any vehicle other than the vehicle or vehicles named in the policy.

*See Jaimes v. State Farm Mut. Auto Ins. Co.*, 53 P.3d 743, 745 (Colo. Ct. App. 2002).  In other

words, the exclusions would prevent an insured from obtaining UM/UIM coverage on all of her

vehicles by only purchasing such coverage for one.  *Id.*  However, in 2001, the Colorado Supreme

Court implicitly called such exclusions into question with its decision in *DeHerrera v. Sentry*

*Insurance Co.*, 30 P.3d 167 (Colo. 2001), by expressing its disapproval of such exclusions in

dicta.  The court found that UM/UIM insurance "provides coverage for *persons*; it does not place

geographical limits on coverage and does not purport to tie protection against uninsured motorists

to occupancy in any kind of *vehicle*."  *DeHerrera*, 930 P.3d at 175 (emphasis in original).

      Subsequently, in *Jaimes*, the Colorado Court of Appeals applied the ruling in *DeHerrera*

expressly to void owned but not insured exclusions and held that "the language and purpose of

the UM/UIM statute require an insurer to provide UM/UIM benefits to a person insured under

the policy when injured in an accident caused by an uninsured or under insured motorist *without*

*regard to the vehicle occupied by the insured at the time of injury*."  53 P.3d at 746 (emphasis in

-4-

orginal).  In arriving at its decision, the *Jaimes* court quoted *DeHerrera* extensively and
emphasized that:

> "the argument can be made that requiring UM/UIM insurance irrespective of the
> vehicle occupied by an insured at the time of injury may encourage unjust results in
> particular circumstances.  For instance, a family owning more than one vehicle may
> purchase insurance for only one vehicle, under the rule of this case, and yet
> recover UM/UIM benefits when struck by an uninsured motorist while occupying
> any of its owned but uninsured vehicles."

*Id.* (quoting *DeHerrera,* 30 P.3d at 176).  Plaintiff contends that in the aftermath of *DeHerrera*
and *Jaimes*, "a policyholder was required to purchase UM/UIM [insurance] on only one vehicle
even if he or she had multiple vehicles."  (Pl.'s Resp. at 14.)  In keeping with this contention,
Plaintiff argues that Defendant's continued collection of UM/UIM premiums on two of her three
vehicles "should operate as a constructive purchase of higher limit UM/UIM [coverage]."
(Compl. ¶ 19.)

### b.      *Procedure of the Instant Case*

On December 30, 2005, Plaintiff filed a complaint in the District Court for the City and
County of Denver, asserting three claims: (1) breach of insurance contract by failing to pay the
higher limit UM/UIM coverage Plaintiff purports to have constructively purchased; (2) breach of
the duty of good faith and fair dealing; and (3) deceptive trade practices in violation of the
Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. § 6–1–101, *et seq*.  (Compl.)
Plaintiff seeks reformation of the insurance contract, compensatory damages, exemplary damages,
and non-economic damages.  (*Id.*)  On January 1, 2006, Defendant removed the case to this
court.  (*Id.*)

On September 26, 2006, Defendant filed a motion for summary judgment, in which it argues: (1) it did not breach any contract or duty of good faith because it had no obligation to pay triple the UM/UIM coverage limit contained in the Policy; and (2) it did not violate the CCPA because it provided only an "all or none" option for UM/UIM coverage of all automobiles on the Policy.[3]  (Def.'s Br.)  On October 20, 2006, Plaintiff responded to Defendant's motion.  (Pl.'s Resp.)  On November 14, 2006, Defendant filed a reply in support of its motion.  (Def.'s Reply in Support of Mot. for Summ. J. [filed Nov. 14, 2006] [hereinafter "Def.'s Reply"].)

## ANALYSIS

### 1.    *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2007); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material

---

[3]Additionally, Defendant argues that this court has no jurisdiction to hear Plaintiff's arguments under the filed rate doctrine. (Def.'s Br.)  This argument is disingenuous.  Plaintiff does not challenge the rates she was charged, but the amount of coverage she received in exchange for the rates charged.  Accordingly, the court does not address this point further.

matter." *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325).  The nonmoving

party may not rest solely on the allegations in the pleadings, but must instead designate "specific

facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P.

56(e) (2007).  A fact in dispute is "material" if it might affect the outcome of the suit under the

governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury

to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.

1997) (citing *Anderson*, 477 U.S. at 248).  The court may consider only admissible evidence when

ruling on a summary judgment motion.  *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d

1467, 1474 (10th Cir. 1985).  The factual record and reasonable inferences therefrom are viewed

in the light most favorable to the party opposing summary judgment.  *Byers v. City of*

*Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

**2.      Evaluation of Claims**

**a.      Reformation and Breach of Contract**

Defendant first asserts it is entitled to summary judgment on Plaintiff's claim for

reformation of the Policy and breach of contract.  (Def.'s Br. at 21–27.)  Plaintiff's arguments

concerning reformation and breach of the Policy are rather difficult to distill with precision.

Plaintiff asserts that after *DeHerrera*, UM/UIM coverage was personal in nature and "therefore,

there was no reason for [Defendant] to charge separate premiums for [] separate vehicles."  (Pl.'s

Resp. at 16.)  Plaintiff maintains that because Defendant continued to charge and collect

premiums on all three of Plaintiff's vehicles, the Policy must be reformed to provide "coverage for

each of the 'personal' premiums they paid" — meaning that Plaintiff constructively "purchased

and paid for three different 'personal' UM/UIM coverages when [Defendant] charged [] three separate premiums" — and Defendant breached the contract by paying only one personal UM/UIM coverage limit.  (*Id.* at 16–17.)

Contract interpretation is "a question of law to be resolved by the court." *Denver Ctr. for the Performing Arts v. Briggs*, 696 P.2d 299, 306 (Colo. 1985).  "'The interpretation of a contract requires the court to ascertain the parties' intent at the time the document was executed, and that intent is to be determined primarily from the instrument itself.'" *N. Y. Life Ins. Co. v. K N Energy*, 80 F.3d 405, 411 (10th Cir. 1996) (quoting *Hefley Ranch, Inc. v. Stewart*, 764 P.2d 415, 416 [Colo. Ct. App. 1988]).  Indeed, "[t]he primary goal of contract interpretation is to determine and give effect to the intention of the parties." *USI Props. East, Inc. v. Simpson*, 938 P.2d 168, 173 (Colo. 1997).  Similarly, under Colorado law, "[t]he purpose of reformation is to give effect to the parties' actual intentions" and reformation "is appropriate only when the instrument does not represent the true agreement of the parties." *Carder, Inc. v. Cash*, 97 P.3d 174, 180–81 (Colo. Ct. App. 2003).  In construing contract language, a court "should not rewrite the provisions of an unambiguous document, but must enforce an unambiguous contract in accordance with the plain and ordinary meaning of its terms." *Id.*  "Whether . . . a contract is ambiguous is also a question of law for the court." *Denver Ctr. for the Performing Arts*, 626 P.2d at 306.  "In ascertaining whether certain provisions of a document are ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words employed . . . and [t]he plain effect of a contract should not be destroyed by strained construction." *Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1232 (10th

Cir. 1999).  The mere fact "'that the parties disagree as to the meaning of the terms of the

contract does not lead necessarily to the conclusion that the contract is ambiguous.'"  *Id.* (quoting

*Denver Ctr. for the Performing Arts*, 626 P.2d at 306).

In the instant case, the Policy very clearly states what UM/UIM coverage is and what

benefits it provides.  To wit:

> UNINSURED MOTORISTS coverage pays for bodily injury which [insureds] are
> entitled to collect from a hit-and-run or uninsured driver who is at fault for the
> accident, and is unable to pay for [the] loss.

> UNDERINSURED MOTORISTS coverage pays for bodily injury which
> [insureds] are entitled to collect from an underinsured owner or driver who is at
> fault for the accident and when the damages exceed the driver's liability coverage.

(Pl.'s Resp., Ex. 1.1 at 14 [Policy].)  The Policy clearly indicates a $300,000 coverage limit per

accident and covers the policyholder, the policyholder's family, and any other occupant of a

covered vehicle.  (*Id.*, Ex. 1.1 at 9, 12 [Policy].)  Further, as previously noted, the Policy states in

all capital letters that policyholders "CANNOT ADD TOGETHER TWO OR MORE LIMITS

OF INSURANCE ON A POLICY COVERING MULTIPLE AUTOMOBILES OR ON

MULTIPLE POLICIES."  (*Id.*, Ex. 1.1 at 14 [Policy] [emphasis in original].)  Finally, the Policy

contains an "owned but not insured" exclusion, which excludes coverage for bodily injury

sustained by an insured "while occupying, or when struck by, any motor vehicle owned by that

insured which is not insured . . . under this [P]olicy."  (*Id.*, Ex. 1.2 at 12 [Policy].)  Given

*DeHerrera* and *Jaimes*, the exclusion is of course unenforceable, but because the accident

involved a vehicle covered under the Policy, enforceability is not at issue here.  All that is at issue

is the parties' intent in executing the Policy and the effect, if any, of the exclusion on that intent.

*See USI Props.*, 938 P.2d at 173 (holding that determining the parties' intent is the primary goal of contract interpretation).

> Plaintiff argues that:
>
> [w]hen [Defendant] provided the Policy . . . indicating that it was providing UM/UIM coverage and was charging a separate premium for each of the vehicles owned at the time of [Mr.] Sewell's death, there is [sic] an ambiguity in the contract . . . . [T]here is a question of fact as to whether that representation and term of the [P]olicy was [sic] ambiguous . . . . The [P]olicy should be reformed to reflect the three separate "personal coverages" which were purchased by [Plaintiff] consistent with the intent of the parties, particularly after *DeHerrera*.

(Pl.'s Resp. at 23–24.)  Looking beyond the opacity of this tortured argument, the court notes that a provision is only ambiguous if it is "reasonably susceptible on its face to more than one interpretation." *Allen v. Pacheco*, 71 P.3d 375, 378 (Colo. 2003).  Fatally to her position, Plaintiff makes no argument as to: (1) why the Policy language would be susceptible to her proffered alternative interpretation; (2) why such an interpretation would be reasonable; or (3) whether she intended such an interpretation at the time the Policy was executed and purchased. (Pl.'s Resp.)  Otherwise stated, the instant case is clearly not analogous to the archetypal cases of ambiguity, such as the confusion betwixt the two bonny ships Peerless or the question whether a sum of ten thousand dollars was meant to be paid in American or Canadian currency.[4]  *See Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1011 n.12 (3d Cir. 1980) (discussing

---

[4]Even if any ambiguity were present, Plaintiff's own testimony quickly clarifies her understanding of the agreement underlying the Policy.  Plaintiff testified she knew that under the Policy: (1) in the event of an accident, she was "limited to $300,000 in uninsured motorist benefits;" and (2) she "couldn't take the $300,000 from [one car] and add that to the $300,000 covering [another car] for a total of $600,000, if [she] were involved as the victim of an accident."  (Def.'s Br., Ex. A at 180–81 [Pl. Dep.].)

ambiguity generally); *Raffles v. Wichelhaus*, 159 Eng. Rep. 375 (Exch. 1864) (concerning two ships named Peerless).

The court finds that the only reasonable interpretation of the Policy's plain language is that Plaintiff and Mr. Sewell intended to purchase UM/UIM insurance that would provide $300,000 of coverage in the event of an accident, independent of which of their three covered vehicles they were driving or who was occupying those vehicles. The plain language in the Policy's conspicuous anti-stacking provision clearly conveys Defendant's intentions to limit an insured to a single recovery of the coverage benefit limit, no matter how many vehicles were covered under a policy or how many policies an insured had purchased. (*See* Pl.'s Resp., Ex. 1.1 at 14 [Policy].) For these reasons, the court is not convinced by Plaintiff's disingenuous argument that "there were three separate policies for which a separate premium was charged and paid" and, "[t]herefore, the anti-stacking language in the Policy is not applicable." (*Id*. at 24.) As evidenced by the clear language of the Policy, Plaintiff was entitled to only one payment of the $300,000 coverage limit benefits, independent of whether she chose to purchase — or now chooses to characterize her purchase as — one policy covering multiple vehicles or multiple policies each covering one vehicle. Accordingly, the court finds no grounds for reformation of the Policy and turns its attention to Plaintiff's claim for breach of contract.

Under Colorado law, "a party attempting to recover on a claim for breach of contract must prove the following elements: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff." *SGI Air Holdings II LLC v. Novartis Int'l AG*, 239 F.

Supp. 2d 1161, 1170 (D. Colo. 2003) (internal quotation marks and citations omitted).  Here,

Plaintiff's breach claim directly hinges upon the success of her prayer for reformation of the

Policy.  After all, it is undisputed that the Policy contemplates a $300,000 UM/UIM coverage

limit and that Defendant paid Plaintiff $300,000 in UM/UIM coverage benefits.  (Def.'s Br., Ex.

A at 189–90 [Pl. Dep.].)  It is only if the Policy underwent the reformation Plaintiff requests that

Defendant would owe a duty to pay the additional UM/UIM benefits Plaintiff now seeks under a

breach theory.  (*See* Pl.'s Resp. at 15.)  Accordingly, it is of particular import that unless and until

an insurance contract is reformed, an insurer has no obligation to conform to such "reformed"

policy.  *Clark v. State Farm Mut. Auto. Ins. Co.*, 319 F.3d 1234, 1239 (10th Cir. 2003).  This

court has already found that reformation is not appropriate in this case.  Therefore, there is no

genuine issue of material fact that Defendant has breached its duty to pay all of the UM/UIM

benefits it owed Plaintiff, namely $300,000.  (Def.'s Br., Ex. A at 189–90 [Pl. Dep.].)  As such,

Defendant is entitled to summary judgment on Plaintiff's breach claim.

### b.    Breach of the Duty of Good Faith and Fair Dealing

Defendant also argues it is entitled to summary judgment on Plaintiff's claim for breach of

the duty of good faith and fair dealing because Plaintiff cannot establish that Defendant treated her

unfairly or tried to make Plaintiff "surrender [her] policy or disadvantageously settle a nonexistent

dispute."[5]  (Def.'s Br. at 28.)  Defendant reasons that it properly offered and provided UM/UIM

---

[5]"In every insurance contract there is an implied covenant of good faith and fair dealing." *Brennan v. Farmers Alliance Mut. Ins. Co.*, 961 P.2d 550, 556 (Colo. Ct. App. 1995).  In Colorado, actions for breach of this implied covenant may sound in contract or tort.  *See Kidneigh v. UNUM Life Ins. Co. of Am.*, 345 F.3d 1182, 1193 (10th Cir. 2003) (explaining

insurance and paid the applicable $300,000 UM/UIM coverage limit under the Policy.  (*Id.* at 28–29; Def.'s Reply at 9.)  In response, Plaintiff contends that Defendant "should have recognized its obligation to pay additional UM/UIM benefits" and "[n]ot having done some [sic] was a breach of its duties [sic] of good faith and fair dealing."  (Pl.'s Resp. at 15.)  Plaintiff baldly asserts that "[t]here is a question of fact whether continuing to charge a premium and thereafter refusing to pay the loss under that personal coverage constitutes good faith and fair dealing. [Plaintiff's expert witness] is of the opinion that it does not, and the evidence in this case would indicate that it does not."  (*Id.* at 24–25.)  Plaintiff's claim must fail.

First, this court has already determined that reformation of the Policy is inappropriate in this case.  The court's finding thus vitiates Plaintiff's claim to the extent it is based on Defendant's purported duty to pay additional benefits.  To the extent Plaintiff's unartfully drafted claim has any other basis, it still fails.  Unfortunately, in her response brief, Plaintiff provides only a general citation to her expert witness's opinion and neither specifies nor points the court to the supposedly indicative evidence she breezily mentions.  (*Id.*)  Plaintiff's response is woefully insufficient, for "[a] brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record."  *Desilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999); *see also L & M Enters. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000)

---

difference between insurance bad faith claim and breach of implied covenant claim); *see also Anderson v. State Farm Mut. Auto. Ins. Co.*, 416 F.3d 1143, 1148 (10th Cir. 2005) (setting forth elements of an insurance bad faith claim).  In the instant case, although Plaintiff does not clarify whether she brings her claim in contract or tort, the issue is rendered moot due to her unquestionably insufficient response.

(deeming conclusory and unsubstantiated allegations insufficient to create a genuine issue of fact

to defeat summary judgment).  It is Plaintiff's dual burden to argue that a genuine issue of

material fact exists and to support her argument with record evidence.  This court declines the

opportunity to perform the latter task in Plaintiff's stead.  *See Celotex*, 477 U.S. at 324 (requiring

designation of "specific facts showing that there is a genuine issue for trial").  Accordingly,

Defendant is entitled to summary judgment on Plaintiff's claim for breach of the duty of good

faith and fair dealing.

     *c.*    *CCPA Violation*

     Finally, Defendant argues that it is entitled to summary judgment on Plaintiff's claim for

violation of the CCPA.  (Def.'s Br. at 29–31.)  Plaintiff asserts that Defendant's "acts and failures

to act" constituted deceptive trade practices under CCPA sections 6–1–105(1)(e), 6–1–105(1)(g),

and 6–1–105(3).  (Compl. ¶ 27.)  Under the CCPA, a plaintiff must establish five elements to be

eligible for relief: (1) conduct by the defendant that constituted a deceptive trade practice; (2) the

deceptive practice occurred in the course of the defendant's business, vocation or occupation; (3)

the practice affected the public interest; (4) the plaintiff suffered an injury to a legally protected

interest; and (5) the defendant's actions in violation of the CCPA caused the plaintiff's injury.  *See*

Colo. Rev. Stat § 6–1–105(1) (2006); *Hall v. Walter*, 969 P.2d 224, 234–35 (Colo. 1998).  As to

the first element, the CCPA defines the term "deceptive trade practice" as, *inter alia*: (1)

knowingly making "a false representation as to the characteristics, ingredients, uses, benefits,

alterations, or quantities of goods, food, services, or property or a false representation as to the

sponsorship, approval, status, affiliation, or connection of a person therewith;" or (2) representing

that "goods, food, services, or property are of a particular standard, quality, or grade, or that goods are of a particular style or model, if he knows or should know that they are of another." Colo. Rev. Stat. §§ 6–1–105(1)(e), 6–1–105(1)(g) (2006).  Plaintiff's reference to section 6–1–105(3) is somewhat puzzling, as said section merely states that the definitions of deceptive trade practices include but are not limited to those set forth elsewhere in the statute.  *Id.* § 6–1–105(3).

Defendant argues that Plaintiff cannot prove the elements of a CCPA claim "[f]or the same reasons that the undisputed evidence demonstrates that [Defendant] did not breach any duty owed to [Plaintiff]."  (Def.'s Br. at 30.)  Defendant asserts it made no representation concerning UM/UIM coverage that it knew or should have known to be false and underscores that *DeHerrera*: (1) did not hold there is no insurance benefit to maintaining UM/UIM coverage on multiple vehicles; (2) did not hold that it is improper to charge premiums for multiple vehicles; and (3) was not a mandate to insurers to change the structure of their policies.  (*Id.* at 29–31; Def.'s Reply at 6–7, 9–10.)  Plaintiff counters that: (1) Defendant's 2006 revision of its policies to require only one premium for UM/UIM coverage "regardless of the number of vehicles" on a policy "creates a question of fact as to whether [Defendant] violated the CPCA [sic];" and, alternatively, (2) Defendant "[p]resumably . . . collected separate premiums from millions of insureds . . . without advising them of the change in the law [under *DeHerrera*]," which is conduct that "violates the CPCA [sic]."  (Pl.'s Resp. at 25, Ex. 2 at 2 [Revised Policy].)

Both Defendant's argument and Plaintiff's one-paragraph response are perhaps best described as "very tragical mirth . . . tedious and brief!"  WILLIAM SHAKESPEARE, A MIDSUMMER

NIGHT'S DREAM, act 5, sc. 1. Plaintiff makes no mention of the elements of a CCPA claim, let alone any references to record evidence to create a genuine issue of fact. (*See* Pl.'s Resp.) First, under no circumstances can anything that "*presumably*" took place serve to create a genuine issue of *fact* to escape summary judgment. (*Id.* at 25.) Further, Plaintiff fails to pinpoint the allegedly violative misrepresentation or even specify the section of the CCPA allegedly violated. (*Id.*) Still, Defendant fares little better. Defendant's adamant insistence that *DeHerrera* did not impose a duty upon insurers to offer a UM/UIM coverage option for only one vehicle does not speak to the timbre of the CCPA. Indeed, Defendant has done little to meet its burden to establish there is no evidence suggesting that the failure to disclose that insuring one vehicle could provide a level of coverage on all vehicles one owned was: (1) a knowing misrepresentation of the standard of UM/UIM coverage; (2) a knowing misrepresentation of the uses and benefits of such coverage; or (3) any other iteration of a deceptive trade practice. *See Celotex*, 477 U.S. at 325 (explaining moving party's burden in summary judgment). This court's determination might have been different, had either party definitively established that Plaintiff and Mr. Sewell purchased the Policy before *DeHerrera* was decided, but clarity and specificity elude Plaintiff and Defendant alike. *See Anderson v. State Farm Mut. Auto. Ins. Co.*, 416 F.3d 1143, 1148 (10th Cir. 2005) (refusing to find CCPA violation where insurer failed to disclose *DeHerrera* UM/UIM coverage changes when plaintiff purchased policy prior to decision). Given the state of the arguments and referenced facts, this court cannot find that, as a matter of law, no CCPA violation occurred. Accordingly, summary judgment is not appropriate on Plaintiff's claim concerning same.

*3.      Conclusion*

Based on the foregoing it is therefore ORDERED that:

1.      Defendant's motion (#39) is GRANTED in part and DENIED in part.  The motion is GRANTED as to Plaintiff's first and second claims and DENIED as to Plaintiff's third claim.

2.      The court will hold a Final Pretrial Conference commencing at 10:15 o'clock a.m. on Friday, August 10, 2007, in Courtroom A201 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado.  In preparing for and participating in the conference, the parties and counsel will (1) follow the Instructions for Preparation and Submission of Final Pretrial Order, a copy of which can be downloaded from the court's web site, specifically http://www.cod.uscourts.gov/forms/ewn_fin_pre_ord_ins.pdf and (2) utilize the specific template located at http://www.cod.uscourts.gov/forms/ewn_fin_pre_ord.wpd  These specific web addresses should be used to insure that the proper format is observed.

Dated this 19th day of July 2007

                                        BY THE COURT:


                                        s/ Edward W. Nottingham
                                        EDWARD W. NOTTINGHAM
                                        Chief United States District Judge